**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| THE ARKANSAS TIMES, INC., * <br> NORTHWEST ARKANSAS * <br> CHAPTER OF THE SOCIETY OF * <br> PROFESSIONAL JOURNALISTS, and * <br> MAX BRANTLEY * <br>  * <br> Plaintiffs * <br>  * <br> VS. * <br>  * <br> LARRY B. NORRIS, director of the * <br> Arkansas Department of Correction * <br>  * <br> Defendant * <br>  * | NO: 5:07CV00195  SWW |

**ORDER**

Plaintiffs Arkansas Times, Inc., a newspaper publisher; the Northwest Arkansas Chapter of the Society of Professional Journalists; and Max Brantley, an Arkansas newspaper editor, bring this lawsuit under 42 U.S.C. § 1983 against Larry Norris, the Director of the Arkansas Department of Correction ("ADC").[1]  Plaintiffs claim that the ADC's lethal-injection execution procedures prevent witnesses from observing all stages of a lethal injection execution in violation of the First Amendment.  By way of relief, they seek an injunction mandating that all phases of lethal-injection executions carried out by the ADC be conducted in full and open view of witnesses.  Before the Court is the State's motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (docket entry #4); Plaintiff's response (docket entry #6); and

---

[1]Plaintiffs acknowledge that the complaint does not state a claim against Norris in his individual capacity and that Plaintiffs are not entitled to monetary damages.  *See* docket entry #7, at 9.

the State's reply (docket entry #8). After careful consideration, and for the reasons that follow, the motion to dismiss will be granted.

I.

In deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), all facts alleged in the complaint are assumed to be true. *See Doe v. Northwest Bank Minn., N.A.*, 107 F.3d 1297, 1303-04 (8th Cir. 1997). The complaint must be reviewed in the light most favorable to the plaintiff, *see McMorrow v. Little*, 109 F.3d 432, 434 (8th Cir. 1997), and should not be dismissed unless it is clear beyond doubt that the plaintiff can prove no set of facts thereunder which would entitle him or her to relief. *See Hafley v. Lohman,* 90 F.3d 264, 266 (8th Cir. 1996). The Court may grant a motion to dismiss on the basis of a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

II.

Since 1983, Arkansas law has provided that the "punishment of death is to be administered by a continuous intravenous injection of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent until the defendant's death is pronounced according to accepted standards of medical practice." Ark. Code Ann. § 5-4-617(a)(1). Defendant Norris has the responsibility to determine the substances to be administered and the procedures to be used in any execution. *See* Ark. Code Ann. § 5-4-617(a)(2).

State law requires, at each execution, the presence of the Director of the ADC, or an assistant; the ADC official in charge of medical services, or an assistant; and "a number of respectable citizens numbering not fewer than six . . . nor more than twelve . . . whose presence is necessary to verify that the execution was conducted in the manner required by law." Ark.

Code Ann. § 16-90-502(d)(2).   Additionally, state law provides that the condemned inmate's attorney and spiritual adviser may attend, and the Director may designate additional persons to be present, "but the maximum number of persons at the execution shall not exceed thirty."  Ark. Code. Ann. § 16-90-502(d)(2).

In the complaint, Plaintiffs describe the lethal injection process as follows.  After the condemned inmate is strapped to a gurney in the execution chamber, ADC employees establish two intravenous ("IV") lines and attach an electrocardiogram monitor to the condemned inmate. Once the IV lines are in place, a curtain across a window that divides the execution chamber from the witness room is lifted.  Witnesses can see a portion of the IV lines that run from the inmate, across the floor of the execution chamber, and into an opening in a glass window that leads to a separate control room.

The inmate makes last statements, and the warden orders the execution to begin.  Two executioners in the control room "begin attaching and plunging up to eight hand-held plastic syringes in a complicated sequence prescribed by the ADC protocol."  Docket entry #1, at 6. Finally, when the prisoner ceases to exhibit signs of life, the Warden summons the coroner to pronounce death.

III.

According to Plaintiffs' allegations, ADC procedures prevent witnesses from seeing or hearing any events that precede the opening of the curtain that blocks witnesses' view to the execution chamber.  They contend that the First Amendment requires that the ADC permit witnesses to observe the entire procedure, including the condemned inmate entering the execution chamber and any procedure necessary to establish IV access.   The State asserts: "Whether Arkansas should keep the curtain open from the time a condemned prisoner enters the

execution chamber s a question of policy for the Arkansas General Assembly and state officials and not a question governed by the First Amendment." Docket entry #5, at 12.

The Supreme Court has never recognized a First Amendment right of access to executions.  In fact, in 1890, in determining that Minnesota's restrictions on access to executions did not violate the ex post facto clause, the Court stated that restrictions regarding the "number and character of those who may witness the execution, and the exclusion altogether of reporters or representatives of newspapers . . . are regulations which the legislature, in its wisdom, and for the pubic good, could legally prescribe . . . . " *Holden v. Minnesota*, 137 U.S. 483, 491, 11 S. Ct. 143, 146 (1890).  And in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814 (1980), the Court noted that penal institutions, where public access is generally limited, do not share the long tradition of openness associated with courtrooms, which had long been open to the public at the time the First Amendment was adopted.  *See Richmond Newspapers,* 448 U.S. at 577 n.11, 100 S.Ct. at 2827 n.11(citations omitted).

Particularly instructive here is the Supreme Court's decision in *Houchins v. KQED, Inc*., 438 U.S. 1, 98 S.Ct. 2588 (1978).  In *Houchin*s, a television station sought and was denied permission to inspect and photograph an area of a county jail known as Greystone, where a detainee had committed suicide allegedly because of jail conditions.  Officials permitted scheduled public tours of portions of the jail that did not include Greystone, and they prohibited the use of cameras or tape recorders.  The station sued, asserting a First Amendment right to access, contending that "public access to penal institutions is necessary to prevent officials from concealing prison conditions from the voters and impairing the public's right to discuss and criticize the prison system and its administration." *Houchins*, 438 U.S. at 8, 98 S. Ct. at 2593.

The district court entered a preliminary injunction enjoining jail officials from denying

media access to Greystone and preventing the media from using cameras and sound equipment and interviewing inmates.  *Houchins*, 438 U.S. at 6-7, 98 S. Ct. at 2592.  The Ninth Circuit affirmed, finding that the public and the media have a First and Fourteenth Amendment right of access to prisons and jails.  *Houchins*, 438 U.S. at 7, 98 S. Ct at 2593.

The Supreme Court reversed,[2] holding that neither the First nor Fourteenth Amendments mandate a right of access to government information or sources of information within the government's control and that the media have no special right of access to prisons beyond that afforded to the general public.  *See Houchins*, 438 U.S. at 16-17, 98 S. Ct. at 2597(plurality opinion)(citing *Pell v. Procunier*, 417 U.S. 817, 94 S. Ct. 2800 (1974); *Saxbe v. Washington Post, Co.*, 417 U.S. 843, 94 S.Ct. 2811 (1974)).  The Court noted that the conditions in jails and prisons are clearly matters of great public importance, but it found that access to penal institutions is a question of policy for a legislative body.  *See Houchins*, 438 U.S. at 12, 98 S. Ct. at 2595(stating that whether to open penal institutions in the manner sought is "clearly a legislative task which the Constitution has left to the political process").  The Court found no basis for reading into the Constitution "a right of the public or the media to enter these institutions, with camera equipment, and take moving and still pictures of inmates for broadcast purposes."  *See Houchins*, 438 U.S. at 8-9, 98 S. Ct. at 2593.

To date, only one federal appeals court has held that the First Amendment includes a right of public access to executions.  In *California First Amendment Coalition v. Woodford*, 299

---

[2]Chief Justice Burger delivered the opinion of the Court, in which Justices White and Rehnquist joined.  *Houchins v. KQED, Inc.*, 438 U.S. 1, 3-16, 98 S. Ct. 2588, 2590-2597(1978)(plurality opinion).  Justices Blackmun and Marshall did not participate in the decision, Justice Stewart wrote a separate opinion, concurring in the judgment, *see Houchins*, 438 U.S. at 16-19, 98 S. Ct. at 2597-2599, and Justices Stevens, Brennan, and Powell entered a dissenting opinion.  *See Houchins*, 438 U.S. at 19-40, 98 S. Ct. at 2599-2610.

F.3d 868 (9th Cir. 2002), the Ninth Circuit held that "the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Woodford*, 299 F.3d at 877. In reaching its decision, the Ninth Circuit applied a test derived from the Supreme Court's decision in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S. Ct. 2814 (1980), which is commonly referred to as the "experience and logic" test.

In *Richmond Newspapers,* the Supreme Court recognized that the First Amendment guarantees public access to criminal trials. *See Richmond Newspapers*, 448 U.S. at 558-581, 100 S. Ct. at 2818-2830 (plurality opinion); *id*. at 584-598, 100 S. Ct. at 2832-2839 (Brennan, J., concurring in judgment); *id*. at 598-601, 100 S.Ct. at 2839-2841 (Stewart, J., concurring in judgment); *id*. at 601-604, 100 S. Ct. at 2841-2842 (Blackmun, J., concurring in judgment). Later, in *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 102 S.Ct. 2613 (1982), the Court noted that "[t]wo features of the criminal justice system, emphasized in the various opinions in *Richmond Newspapers*, together serve to explain why a right of access to criminal trials in particular is properly afforded protection by the First Amendment." *Globe Newspaper Co.*, 457 U.S. at 605, 102 S.Ct. at 2619. The Court explained:

> First, the criminal trial historically has been open to the press and general public. "[A]t the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open." And since that time, the presumption of openness has remained secure. Indeed, at the time of this Court's decision in *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L. Ed. 682 (1948), the presumption was so solidly grounded that the Court was "unable to find a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country." This uniform rule of openness has been viewed as significant in constitutional terms not only "because the Constitution carries the gloss of history," but also because "a tradition of accessibility implies the favorable judgment of experience."

> Second, the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process.  And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process-an essential component in our structure of self-government.  In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

*Globe Newspaper Co.*, 457 U.S. at 605-606, 102 S. Ct. at 2619.

The Supreme Court has extended the right of public access to criminal trials to certain pre-trial proceedings and transcripts in criminal cases, *see Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819 (1984)(finding a First Amendment right to attend voir dire examinations during criminal trial); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735 (1986)(finding a First Amendment right to access transcripts of adversarial preliminary hearings that occur prior to a criminal trial), but it has never applied the *Richmond Newspapers* experience and logic test beyond the context of judicial proceedings that are part of the criminal trial process.

Even assuming that the *Richmond Newspapers* test applies here, the Court disagrees that the considerations of experience and logic prescribe a First Amendment right to public access to executions.

*Experience*

The openness of criminal trials has "long been recognized as an indispensable attribute of an Anglo-American trial." *Richmond Newspapers*, 448 U.S. at 569, 100 S. Ct. 2823.  In contrast to the unbroken, uncontradicted history of public access to criminal trials, in the 1830s, executions in the United States became private events and moved from the public square to

inside prison walls.³ *See* Michael Madow, *Forbidden Spectacle: Executions, the Public and the Press in Nineteenth Century New York*, 43 Buff. L. Rev. 461, 557 (1995).

Since 1887, Arkansas law has provided that executions carried out by the State will be private. *See* Act of Mar. 1, 1887, Pub. L. No. 24, § 1, 1887 Ark. Acts 29; *see also* Arkansas Code § 16-90-502(d)(1)("No execution of any person convicted in this state of a capital offense shall be public, but shall be private."). State law requires that six to twelve respectable citizens be present at an execution to verify that the execution was conducted in the manner required by law--that is, by "continuous intravenous injection of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent until the defendant's death is pronounced according to accepted standards of medical practice." Ark. Code Ann. 5-4-617(a)(1). However, the presence of six to twelve citizen witnesses does not transform a private execution into a public proceeding comparable to a criminal trial.⁴

*Logic*

---

³In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726 (1972), Justice Brennan noted that the American practice of punishing criminals by death has changed greatly over the years. He stated that "concern for decency and human dignity . . . has compelled changes in the circumstances surrounding the execution itself. No longer does our society countenance the spectacle of public executions . . . we reject public executions as debasing and brutalizing to us all." *Furman*, 408 U.S. at 297, 92 S. Ct. at 2756(Brennan, J., concurring). In a separate opinion, Justice Marshall stated that the horrors of the death penalty were somewhat diminished in the minds of the general public when "executions which had once been frequent public spectacles, became infrequent private affairs." *Furman*, 408 U.S. at 340, 92 S. Ct. at 2778 (Marshall, J., concurring).

⁴In *Richmond Newspapers*, the Court noted that even when the "town meeting" form of trial became too cumbersome, and 12 members of the community were delegated to act as its surrogates, the community did not surrender its right to observe the conduct of trials and retained a "right of visitation." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572, 100 S. Ct. 2814, 2824-2825 (1980)(plurality opinion). The public retained no similar "right of visitation" when executions became private.

An execution carried out by lethal injection is the State's designated procedure for carrying out a lawfully imposed death sentence. It bears little resemblance to a criminal judicial proceeding, where public participation plays an indispensable functional role in the process itself, and where public access enables citizens to judge whether our system of criminal justice is fair. Plaintiffs argue that public access can also play a significant role in the proper functioning of capital punishment and that informed public debate is critical in determining whether execution by lethal injection comports with the evolving standards of decency which mark the progress of a maturing society. Although Plaintiffs' argument has practical appeal, without an enduring tradition of public executions, it cannot serve as a basis for reading a right of public access into the First Amendment.[5] *See Houchins*, 438 U.S. 12, 13, 98 S. Ct. 2588, 2596 ("We must not confuse what is 'good,' 'desirable,' or 'expedient' with what is constitutionally commanded by the First Amendment.").

IV.

For the reasons stated, the Court finds that Plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. Accordingly, Defendant's motion to dismiss (docket entry #4) is GRANTED. Pursuant to the judgment entered together with this order, this case is dismissed with prejudice.

---

[5]In *Richmond Newspapers*, Justice Brennan, a proponent of the structural or functional theory of the First Amendment, cautioned that the stretch of First Amendment rights based on the structure of our constitutional government is theoretically endless, and must be invoked with discrimination and temperance. "For so far as the participating citizen's need for information is concerned, 'there are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.'" *Richmond Newspapers*, 448 U.S. at 587, 100 S.Ct. at 2833(Brennan, J., concurring)(quoting *Zemel v. Rusk*, 381 U.S. 1, 16-17, 85 S. Ct. 1271, 1281 (1965)).

IT IS SO ORDERED THIS 7th  DAY OF JANUARY, 2008.

<u>/s/Susan Webber Wright</u>

UNITED STATES DISTRICT JUDGE